## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Nicholas D. Precourt, being duly sworn, depose and state as follows:

### Agent Background

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I am a Detective with the Norton Police Department, where I have worked since 2009. Since August 2023, I have been assigned to the Drug Enforcement Administration ("DEA") New Bedford Resident Office ("NBRO") as a Task Force Officer ("TFO"). I am a graduate of the Plymouth Police Academy and have attended training classes related to the illegal distribution of narcotics, including DEA Basic Narcotics School, Street Level Narcotics School, Meaningless Ride Seminar, Combating Heroin Seminar, and Cultivating Confidential Informants.

3.      Throughout my career, I have conducted or participated in the arrest of narcotics offenders, controlled purchases of narcotics, and drug-related surveillance. I have been the case detective on undercover operations in which an undercover police officer purchased illegal narcotics. I have been the affiant for search warrants for places where narcotics, narcotic paraphernalia, and United States currency were located. Through my training and experience, I have observed numerous types of controlled substances and am familiar with the paraphernalia associated with the distribution and use of these substances, the ways in which they are commonly packaged, the prices charged for them, and the jargon associated with their sale and use.

4.      Based on my training and experience, I am also familiar with narcotics traffickers' methods of operation, including methods used to distribute, store, and transport narcotics, and to collect, expend, account for, transport, and launder drug proceeds.

5.      Since July 2024, I have been investigating Candelario ESPINO, █████████ ████████, Oliver Jose ORTEGA Lopez, and others known and as yet unidentified (the "Target Subjects") for violations of 21 U.S.C. §§ 841 and 846 (distribution of controlled substances and conspiracy to commit same) (collectively, the "Target Offenses").

6.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, confidential sources of information, physical and electronic surveillance, drug seizures, and my personal review of records relating to the investigation.

**Purposes of the Affidavit**

7.      I submit this affidavit in support of an application for a criminal complaint charging ESPINO, █████████, and ORTEGA with one count of conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl and 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846 (the "Charged Offense"). Based on the facts in this affidavit, there is probable cause to believe that ESPINO, █████████, and ORTEGA have committed the Charged Offense, ████████████████████████████████████████, and 50 grams or more of methamphetamine are attributed to ESPINO and ORTEGA.

8.      I also submit this affidavit in support of applications for search warrants for the following residences and the cellular phones located therein for fruits and instrumentalities of the Target Offenses, described more fully in Attachment B:

- Target Location 1: 560 Warren Street, Apartment 2, Boston, Massachusetts. Target Location 1 is further described in Attachment A-1.

- Target Location 2: The basement apartment of 6 Hillside Avenue, Chelsea, Massachusetts. Target Location 2 is further described in Attachment A-2.

- Target Location 3: 16 Margin Street, Apartment 6, Lynn, Massachusetts. Target Location 3 is further described in Attachment A-3.

9.      As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint and warrants. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

10.      All times are approximate.

## Probable Cause

### Background

11.      In April 2024, the DEA began investigating a person ("CD") for drug trafficking. That summer, DEA learned that that CW dealt crystal methamphetamine and cocaine and travelled to Boston two or three times a week to buy drugs to sell. Subsequently, DEA seized crystal methamphetamine, fentanyl, and ammunition from CD through two controlled purchases in July 2024 and the execution of a state search warrant at CD's residence on August 2, 2024.[1]

12.      On August 2, 2024, after investigators executed the warrant and read *Miranda* warnings, CD consented to the search of his telephone. On that day, CD also informed investigators

---

[1] On August 2, 2024, CD was in a cooperative posture, but s/he subsequently stopped cooperating. In connection with the execution of the warrant, CD was arraigned in Bristol Superior Court on charges of trafficking controlled substances, distribution of and possession with intent to distribute cocaine, and unauthorized possession of ammunition. CD's criminal history includes arrests and convictions for domestic violence, failure to appear, assault with a dangerous weapon, breaking and entering, and driving under the influence. Information provided by CD was corroborated to the extent possible, led to the seizure of narcotics, and is believed to be reliable.

that s/he was going to pick up one pound of crystal methamphetamine from a source in Boston later that day and that the source was saved in his/her phone under the name "Trust." As explained below, investigators later determined that Trust is ESPINO.

13.    CD explained that s/he typically would contact ESPINO via the Signal messaging application ("Signal") and tell ESPINO what s/he would want to buy, and ESPINO would direct CD to a location in Boston at which either ESPINO or a courier would sell the drugs to CD. Based on experience and training, investigators know that Signal is a communication application which uses end-to-end encryption, similar to WhatsApp or Telegram.  Investigators further believe that drug traffickers commonly use these types of end-to-end encrypted applications to shield their communications from law enforcement detection. CD then agreed to facilitate the purchase of methamphetamine from ESPINO on August 2, 2024, that is described in more detail below.

14.    Using the Signal messages from CD's phone, investigators identified ESPINO's telephone number and iCloud account and obtained a federal search warrant for historical information for that iCloud account. Through surveillance and other investigative tools, such as federally approved search and tracking warrants, investigators learned about ESPINO's drug trafficking organization, including significant locations. In general, relevant events are listed in chronological order rather than in the order in which investigators learned about them.

**June 6, 2024: ESPINO directed the delivery of suspected narcotics to Target Location 2.**

15.    On June 6, 2024, ESPINO exchanged messages with a contact saved as "Oliver" who used a telephone number ending in 5272 (the "ORTEGA Phone"). According to information obtained from AT&T pursuant to an administrative subpoena, the ORTEGA Phone is subscribed

to "Jose ORTEGA." ORTEGA's criminal record listed his father's name as "Jose/Frank." Based on those facts and observations, investigators believe ORTEGA uses the ORTEGA Phone.

16.     Based on iMessages obtained pursuant to a federal iCloud warrant, which were exchanged between 2:03 a.m. on June 6, 2024, and 10:14 a.m. on June 7, 2024, between ESPINO's and ORTEGA, I believe that ESPINO knowingly supplied narcotics to ORTEGA for resale and directed ORTEGA to return whatever he had not yet sold to Target Location 2, where someone else would refund ORTEGA and then perhaps sell the product to his own customers.

17.     Based on my training, experience, and this investigation, I believe:

   a) After ORTEGA complained about the drugs he got from ESPINO, ESPINO advised him to bring the drugs back for a refund.

   b) ESPINO agreed to "take back" what he had sold to ORTEGA and directed ORTEGA to return what ORTEGA believed to be more than a quarter pound of drugs to "6 hillside ave," which is the address of Target Location 2.

   c) ORTEGA told ESPINO he got $400 for the drugs from Target Location 2, and ESPINO told ORTEGA that the person who received the drugs sold them and that ESPINO would find a different source of drugs for ORTEGA.

18.     Based on my training, experience, these messages, and other information gathered though his investigation, I believe that ESPINO had a continuous agreement to supply more than a quarter pound of controlled substance to ORTEGA at a time for resale, that Target Location 2 is a place where ESPINO delivers drugs and picks up drug proceeds, and that the person who was at Target Location 2, who investigators later determined to be Randy Mazin ("Mazin") eventually sold the drugs that ORTEGA dropped off at that location.

**August 2, 2024: ESPINO, through a courier, caused the delivery of approximately 175 grams of pure methamphetamine to an undercover officer.**

19.      On August 2, 2024, after the execution of the search warrant referenced above in

paragraph 11, CD, in front of investigators, contacted ESPINO through Signal.[2] CD told ESPINO, in a voice call via Signal in front of investigators, that he wanted to buy methamphetamine for $1,300. ESPINO told CD to contact him when he was in the city (Boston).

20.    CD and two investigators traveled together to Boston. Once in Boston, CD, while in the presence of the investigators, was contacted by someone with the username "Ghost" on Signal.[3] CD identified Ghost, who investigators believe is Diego Carrasco ("Carrasco"), as one of ESPINO's runners.[4] Carrasco, via Signal, directed CD to the area of Mount Hope Street in Boston. Soon after, an undercover officer drove to Mount Hope Street in Boston in an undercover vehicle, and surveillance units set up in the area. CD remained in a vehicle with investigators.

21.    Carrasco then messaged CD, "u on mount hope." CD responded by describing the undercover vehicle, which the undercover officer was driving, as the car with which Carrasco should meet. Shortly afterwards, a GMC Arcadia (the "Arcadia") arrived in the area and parked behind the undercover vehicle. Law enforcement arrested the driver of the Arcadia, who was identified as Carrasco. On Carrasco's person, investigators found a Ziploc bag of suspected crystal methamphetamine.

22.    On August 26, 2024, DEA's New England Laboratory confirmed that the substance seized from Carrasco on August 2, 2024, contained 177.4 grams of methamphetamine Chloride, 175.6 grams of which was pure substance.

---

[2] The text messages over Signal between CD and ESPINO between May 30, 2024, and August 2, 2024, have been preserved, and investigators have reviewed those messages.

[3] The text messages over Signal between CD and Ghost on August 2, 2024, have been preserved, and investigators have reviewed those messages.

[4] On August 5, 2024, in connection with this transaction, Carrasco was arraigned in West Roxbury District Court for trafficking methamphetamine, among other charges.

**August 2024: Investigators identified ESPINO as the user of the ESPINO Phone.**

23.    On August 2, 2024, CD positively identified Trust as ESPINO after investigators showed him an RMV photograph that depicted ESPINO. Investigators also independently identified ESPINO through records of the CashApp financial application ("CashApp"), which the listed the phone number for ESPINO's account as (857) 316-6113 (the "ESPINO Phone").

24.    Information obtained from T-Mobile pursuant to an administrative subpoena showed that the ESPINO Phone was subscribed to "Ron Artest" and "Pamella Paling" at 420 Harvard Street, Apartment 206, Brookline, Massachusetts 02446. CD identified Paling through an RMV photograph and described her as ESPINO's girlfriend.

25.    After CD provided investigators with consent to search his/her phone, investigators obtained messages exchanged between CD and ESPINO via the ESPINO Phone between May 30, 2024, and August 2, 2024. In those communications, ESPINO, among other things, in lightly coded language, discussed his ability to provide CD with "tea," "tee," and "t," which I know to be methamphetamine, "c," meaning cocaine, "Downstairs," which is a street name for fentanyl, and "Blues," which I know to refer to counterfeit oxycodone pills containing fentanyl. Communications between CD and ESPINO also included exchanges in which they discussed trading drugs for firearms. Both CD and ESPINO were convicted felons at the time.

26.    Relying in part on those messages, investigators in August 2024 obtained a search warrant for location data regarding the ESPINO Phone (the "September 2024 Location Data Warrant") and a federal search warrant for ESPINO's iCloud account in November 2024 (the "November 2024 iCloud Warrant").

**September 9, 2024: Investigators established that Target Location 1 is ESPINO's residence.**

27.    On September 9, 2024, DEA investigators established surveillance in the area of Target Location 1, after court-authorized location data (the "location data") for the ESPINO Phone showed that between 9:27 a.m. and 12:57 p.m. on that day, the ESPINO Phone alternated between two locations that were either at or near Target Location 1.

28.    At about 9:45 a.m. that morning, investigators saw a Mercedes Benz sedan bearing Massachusetts registration 3SPY98 (the "Mercedes") parked in front of the building in which Target Location 1 is located. RMV records showed that the Mercedes is registered to Paling at Target Location 1. Investigators also saw a grey Jeep Grand Cherokee bearing Massachusetts registration 3TPG97 (the "ESPINO Vehicle")[5] parked on Warren Street, near the building that contains Target Location 1.

29.    At about 11:00 a.m. that morning, investigators saw a man exit the building at 560 Warren Street, in which Target Location 1 is located, and walk south. About a half hour later, investigators saw the same man operating the ESPINO Vehicle. The man exited the ESPINO Vehicle, retrieved some items from the trunk, and walked south. At that point, an investigator took a picture of the man and determined that the man was ESPINO by looking at his driver's license photograph and an inmate photograph of ESPINO that investigators had obtained. ESPINO's driver's license, which is currently expired, contained an address of 560 Warren Street, Apartment 2, Dorchester, Massachusetts 02121, which is Target Location 1.

---

[5] The ESPINO Vehicle is registered to a "Beatriz del Carmen Couho" at an address in Quincy, Massachusetts. Messages from ESPINO's iCloud account show that he rented the ESPINO Vehicle from a private person at a rate of $500 per week. Based on their training and experience, investigators believe that ESPINO rents the ESPINO Vehicle from a private person (as opposed to a rental company) to protect his identity and to avoid law enforcement detection.

30.     Based on my experience and training, and information obtained through this investigation, such as the address on ESPINO's expired driver's license, CD's identification of Paling as ESPINO's girlfriend, the records described above, and ESPINO's activities in and around Target Location 1, investigators believe that ESPINO lives at Target Location 1.

**October 23, 2024: ESPINO exchanged iMessages**
**about drugs and payment with ORTEGA.**

32.     On October 23, 2024, ESPINO, in coded language, told ORTEGA, who investigators believe is a dealer who sources drugs from ESPINO, via the ORTEGA Phone that he would leave him a pound of methamphetamine for $3,400. Other messages indicate that ORTEGA was going to give ESPINO some money before ESPINO left for somewhere.

33.     Based on my training and experience and the information obtained through this investigation, I believe that these iMessages show that ESPINO conspired with ORTEGA to distribute narcotics. Specifically, I believe that ESPINO sold large quantities of methamphetamine to ORTEGA for ORTEGA to sell to ORTEGA's own drug customers.



36.

**November 19, 2024: ESPINO negotiated a drug transaction
with a person connected to Mazin.**

37.    On November 18, 2024, ESPINO exchanged messages with a person with the initials J.C., who investigators believe is a dealer who sources drugs from ESPINO.

38.    On November 19, 2024, ESPINO exchanged messages with J.C. in which he discussed a transaction of three ounces of suspected methamphetamine for $1,050. ESPINO quoted a price of "4 for 1300 or 3 for 1150" before correcting the price to "3" for "1050." Based on my training and experience and knowledge of this investigation, I believe that ESPINO was negotiating a sale of crystal methamphetamine for resale rather than for personal use.

39.    J.C. asked ESPINO why the price was so high. ESPINO responded that the prices had been like that for over a month and to ask "Randy." Based on my training and experience, and information obtained through this investigation, as explained in more detail below, I believe that Randy is Mazin, who lives at Target Location 2 and who also sources drugs from ESPINO.





The GONZALEZ Vehicle traveled to the end of Logan Street, took a left onto Jackson Street, and pulled to the side of the road. A few minutes later, Nunez-Guerrero exited the ████████████████ holding what looked like a Christmas gift bag in his hand.

44.    Law enforcement then detained Nunez-Guerrero and advised him of his *Miranda* rights, in Spanish. Nunez-Guerrero complied with the investigators' orders to turn over the bag. Inside the bag was a black plastic bag with a rectangular cellophane wrapped "brick" that was consistent with the packaging of kilogram quantities of narcotics.

45.     In a post-Miranda interview, Nunez-Guerrero stated that he obtained the package from the ███████████████████████████████████████████████.

46.     Nunez-Guerrero was subsequently charged in Lawrence District Court with trafficking 200 grams or more of fentanyl. On December 13, 2024, the DEA's New England Laboratory confirmed that that substance seized from Nunez-Guerrero was positive for fentanyl and weighed 974.6 grams.

**December 18, 2024: ESPINO engaged in a series of suspected drug-related transactions while travelling between the areas of Target Locations 1, 2, and 3.**

47.     On December 18, 2024, at approximately 11:00 a.m., ESPINO exited from the door of 560 Warren Street (in which Target Location 1 is located) and entered the ESPINO Vehicle. ESPINO then engaged in investigators believe was a hand-to-hand transaction near Target Location 1. Then, at 11:37 a.m., ESPINO messaged a person that he was "picking up pape as we speak" so he could "cash out 2 maybe 3." Based on my training and experience, I know that the term "paper" refers to cash. I also believe that ESPINO was saying that he was going to pick up drug proceeds so he could buy more drugs.

48.     At 12:14 p.m., the ESPINO Vehicle arrived at a Chase Bank. At 12:28 p.m., investigators saw ESPINO exit the bank and enter the ESPINO Vehicle. Investigators believe, based on iMessages obtained pursuant to a federal search warrant (the "January 2025 iCloud Warrant"), that ESPINO could not get money from the bank on December 18, 2024.[6]

49.     At 12:28 p.m., ESPINO began exchanging messages with ORTEGA via the

---

[6] Based on their training, experience, and this investigation, investigators believe that: 1) on December 23, 2024, ESPINO messaged a courier. "I had went to 3 different chase banks and none of them shits would let me get to the atm the card readers all fucked up"; and 2) on December 25, 2024, ESPINO messaged that courier, "i gotta find a chase that will let me into the atm."

ORTEGA Phone. ESPINO told ORTEGA that he needed to see him, and ORTEGA replied that he had ESPINO's money. ESPINO told ORTEGA he had run out of drugs before clarifying that he had a "qp left." Based on my training and experience, I know that "qp" refers to a quarter pound of drugs, typically methamphetamine. ESPINO then asked ORTEGA if he could come to Chelsea. ORTEGA replied he was in an Uber, and ESPINO told him not to come to Chelsea.

50.     After stopping at a Burger King for two minutes, the ESPINO Vehicle travelled to the area of Target Location 2, arriving at 12:50 p.m. At 12:57 p.m., ESPINO exited Target Location 2. The ESPINO Vehicle left the area at 1:00 p.m. Based on my training and experience, and information gathered during this investigation, including messages in which I believe that ESPINO told someone he was collecting drug proceeds, that ESPINO was not able to get cash from ATM machines, and that ESPINO stayed in the area of Target Location 2 for only seven minutes, I believe ESPINO collected drug proceeds from Target Location 2.

51.     The ESPINO Vehicle then traveled directly to the area of Target Location 3, arriving at 1:20 p.m. At that time, ESPINO messaged ORTEGA that he was "out back." Based on my training and experience, my knowledge from the investigation that ESPINO had told ORTEGA that he had only a quarter pound of drugs and that ESPINO was not able to get cash from ATM machines, and messages showing that ESPINO told someone at 11:37 a.m. that he was collecting drug proceeds, I believe ESPINO collected drug proceeds from Target Location 3.

52.     At 1:52 p.m., the ESPINO Vehicle left the area of Target Location 3. Investigators believe, based on iMessages obtained pursuant to the January 2025 iCloud Warrant, that ESPINO then negotiated with a source to buy controlled substances for $1,300 each. In those iMessages, ESPINO stated that he would need a half hour to return to Target Location 1, that he was coming from Lynn (where Target Location 3 is located), and that he was "[p]icking up the cash."

53.     At 5:54 p.m., ESPINO messaged ORTEGA to ask him to tell ESPINO where ORTEGA had the "rest" so that ESPINO could bring ORTEGA "another one." ESPINO said he was leaving for the Dominican Republic the next day and wanted to get ORTEGA "right." Based on my training and experience and this investigation, I believe that ESPINO was asking ORTEGA for drug proceeds owed to ESPINO so ESPINO could supply drugs to ORTEGA.

54.     Starting at 6:44 p.m., the ESPINO Vehicle left the area of Target Location 1, stopped near an Apple store in the Back Bay (where messages indicated he had an order for pickup), and traveled directly to the area of Target Location 2 (in Chelsea), arriving at 7:55 p.m. Based on my training and experience and belief that ESPINO had recently bought drugs, I believe that ESPINO went to Target Location 2, where Mazin lives, to deliver the drugs for resale.

55.     Based on iMessages exchanged between ESPINO and various people over the next few hours and GPS data obtained pursuant to a federal tracking warrant, investigators believe that ESPINO delivered drugs to customers in Brockton and Arlington. Around the time at which the ESPINO Vehicle arrived in Arlington, iMessages show that ESPINO also messaged ORTEGA to ask if he could come to ESPINO. ORTEGA told ESPINO that he did not have a car. ESPINO asked ORTEGA if he could send drug proceeds to ESPINO through Chime or CashApp or whether ORTEGA needed a ride to a bank. ESPINO further stated that he was trying to leave ORTEGA a "hp" so the more money ORTEGA could give ESPINO the better. Based on my training and experience, I know that the term "hp" refers to a half pound of drugs, often methamphetamine. ESPINO provided ORTEGA CashApp information.

56.     At 11:53 p.m., the ESPINO Vehicle departed the area of Arlington where his customer lived and travelled to the area of Target Location 3, in Lynn, arriving on December 19, 2024, at 12:24 a.m. At that time, ESPINO messaged ORTEGA that he was "out back."

57.     Starting at 12:34 a.m. on December 19, 2024, the ESPINO Vehicle traveled from the area of Target Location 3 to the area of Target Location 1, arriving at 1:11 a.m.

58.     In sum, based on my training, experience, and the information collected over the course of this investigation, I believe that, between the late morning of December 18, 2024, and the early morning of December 19, 2024, ESPINO travelled between Target Locations 1, 2, and 3 to pick up drugs to sell to customers, collect drug proceeds, and to obtain more drugs to sell. I believe he used the proceeds collected from Target Locations 2 and 3 to buy more drugs, which he had delivered to him at Target Location 1, before leaving Target Location 1 in the evening to deliver drugs to Mazin at Target Location 2 and collect proceeds from ORTEGA at Target Location 3. I also believe that ESPINO stored the proceeds at Target Location 1, his final stop.

**Between December 19, 2024, and January 2, 2025, when ESPINO was out of the country, ESPINO directed a courier to deliver drugs to Target Location 2 and Target Location 3.**

59.     On December 22, 2024, based on iMessages obtained by investigators through the January 2025 iCloud Warrant, investigators believe that ESPINO directed an unidentified person ("UP1"), to collect drug proceeds at Target Location 2.

   a.   First, ESPINO messaged UP1, "Also Chelsea got cash for me u can scoop." Based on my training and experience, I believe that ESPINO asked UP1 in coded language to pick up drug proceeds from Mazin at Target Location 2.

   b.   Later, UP replied, and ESPINO messaged UP1, "Chelsea be home by 6." Based on my training and experience, I believe ESPINO meant, in coded language, that Mazin would be home (Target Location 2) by 6.

   c.   UP1 then messaged with ESPINO about collecting money from a person whose name started with "A." Later that day (December 22, 2024), UP1 messaged ESPINO, "Yo broski he said 7 so set that up wit Chelsea so i can slide over there at 6 then head straight to A." I believe that UP1 was asking ESPINO to let Mazin know that UP1 would be at Target Location 2 at 6 p.m. to pick up drug proceeds and then head over to another place, where the person whose name began with A would be.

60. On December 25, 2024, in iMessages obtained pursuant to an iCloud warrant, ESPINO at 4:52 p.m. told UP1, "Can u bring mans a q when u free." I believe ESPINO was telling UP1 to bring a quarter pound of drugs to a customer. UP1 responded in the affirmative and said, "ask him where he at," which I believe meant that UP1 was asking ESPINO where the customer was. At 4:58 p.m., ESPINO responded, "Margin" and "Lynn." The street address for Target Location 3 is 16 Margin Street in Lynn. Based on this exchange, I believe that ESPINO sent a quarter pound of methamphetamine, through UP1, to ORTEGA at Target Location 3.

61. On December 26, 2024, based on iMessages obtained pursuant to the January 2025 iCloud warrant, investigators believe ESPINO, in coded language that included referring to Mazin as "Chelsea," directed UP1 to drop off drugs and pick up money from Target Location 2.

    a. ESPINO messaged UP1, "Yo manito whenever u can see Chelsea lmk he got bread and need a q." I believe that in those messages, ESPINO was telling UP1 that Chelsea (Mazin) had money for a quarter pound of drugs and that UP1 should go to Target Location 2, which was located at 6 Hillside Avenue in Chelsea, to deliver drugs and pick up money.

    b. At 4:12 p.m., ESPINO told UP1, "Aight Malden ready," which I believe meant that a customer in Malden was ready. UP responded, "bet Randy to?", which I believe meant that UP1 was saying that Mazin was also ready for UP1 to come by to drop off drugs and pick up money. At 4:20 p.m., ESPINO directed UP1, "Randy q," which I believe was ESPINO telling UP1 to deliver a quarter pound of drugs to Mazin.

    c. At 6:27 p.m., UP1 messaged ESPINO, "im out here" and "no open," which I believe meant that UP1 was telling ESPINO he was at Mazin's residence and Mazin was not opening the door. I believe UP1 was referring to Target Location 2, because in the next set of messages, still at 6:27 p.m. on December 26, 2024, ESPINO told UP1, "U just gotta go down cus he don't answer." I believe that ESPINO was telling UP1 that he needed to go to the basement apartment of 6 Hillside Avenue in Chelsea, which is Target Location 2, because Mazin would not answer if UP1 went to front door.

    d. Then, UP messaged ESPINO that he did not see Mazin's pickup truck at the residence. Investigators believe that Mazin drives his mother's pickup truck. ESPINO responded to UP that Mazin was at Home Depot down the street at the checkout counter."

62.     On December 27, 2024, based on iMessages obtained pursuant to the January 2025 iCloud Warrant, investigators believe that ESPINO asked UP1 to deliver drugs to and collect drug proceeds from Mazin.

   a.   At 4:56 p.m., ESPINO messaged UP1, "Manito randy hit me for whenever no rush, lmk what he gave u yesterday." Based on my training and experience, I believe that ESPINO was telling UP1 that Mazin asked ESPINO for more drugs and ESPINO wanted to know what Mazin gave UP1 the day before as far as money.

   b.   UP1 replied, "ya what he nUPded ima have to break the pie down." I believe that UP1 was asking ESPINO what quantity of drugs Mazin wanted so UP would know how to portion it. UP1 also messaged, "he gave me 9 yesterday," which I believe meant that Mazin gave UP $900 the day before.

   c.   At 4:38 p.m., UP asked ESPINO, "what am i taking him?" and "q?", to which ESPINO responded, "Yezzir." Based on the price ($900), I believe that ESPINO directed UP1 to deliver a quarter pound of methamphetamine to Mazin.

63.     Based on iMessages from January 2, 2024, investigators believe that ESPINO directed UP1 to deliver drugs and pick up proceeds from ORTEGA at Target Location 3. Specifically, at 4:24 p.m., ESPINO messaged UP1, "Manito can u see Oliver ? He want a q he owe me 600 and he want some weed too." Based on my training and experience, and that ORTEGA's first name is Oliver, ESPINO was directing UP1 to drop a quarter pound of drugs to ORTEGA and collect at least $600 in drug proceeds." In the next message, ESPINO sent UP1 the phone number associated with the ORTEGA Phone.

**January 6, 2025: Law enforcement responded to a suspected overdose at Target Location 2, and the ESPINO Vehicle visited that address later that day.**

64.     On January 6, 2025, just after 5:00 a.m., the Chelsea Police Department responded to a report of an unresponsive party at Target Location 2. Officers entered the basement apartment of the building at that address (6 Hillside Avenue in Chelsea), where they encountered Mazin, who law enforcement described as "living in the apartment, J.C., with whom ESPINO in November

17

2025 exchanged messages that investigators believe show that J.C. sources drugs to sell from ESPINO, and a third person who was breathing but unconscious on the bathroom floor.

65.    That same day, GPS data obtained pursuant to a federal tracking warrant showed that the ESPINO Vehicle arrived at the area of Target Location 2 at 7:33 p.m. and left at 8:05 p.m.

### January 16, 2025: Trash from 6 Hillside Avenue,
### in which Target Location 2 is located, contained drug residue.

66.    On January 16, 2025, two employees of the Chelsea Department of Public Works, at the direction of investigators, removed five trash bags from a trash can located on the curb in front of 6 Hillside Avenue, in which Target Location 2 is located. Investigators followed the employees to the Chelsea Police Department, where they searched the bags.

67.    In one bag, investigators found a plastic bag with white residue and mail addressed to Mazin at 6 Hillside Avenue, Chelsea, Massachusetts 02150, albeit without an apartment number. Among other items, investigators also found a food delivery receipt for a "Randy M." with directions to leave food at 6 Hillside Ave in "Basement, door is down in yard." In another bag, investigators found a plastic bag with white residue and a small amount of a white, crystal-like substance. A field test for that substance was positive for methamphetamine.



68.    At 1:22 p.m. on January 14, 2025, ▮▮▮▮▮▮▮▮ traveled directly to the area of 560 Warren Street in Boston, Massachusetts, which is the building in which Target Location 1 is located. ▮▮▮▮▮▮▮▮



**January and February 2025: The ESPINO Vehicle travelled between the areas of the three Target Locations in a manner that is consistent with drug trafficking activity.**

72.    On January 19, 2024, the ESPINO Vehicle arrived in the area of Target Location 3 at 5:52 p.m. Starting at 6:10 p.m., the ESPINO Vehicle left the area to travel to the area of Target Location 1. At 9:39 p.m., the ESPINO Vehicle left the area of Target Location 1 before travelling to the area of Target Location 2, where it stayed until 12:10 a.m. At 12:32 p.m., the ESPINO Vehicle arrived in the area of Target Location 1. On January 24, 2025, the ESPINO Vehicle arrived in the area of Target Location 2 at 7:11 p.m. The ESPINO Vehicle left that area six minutes later.

73.    On February 5, 2025, starting at 2:12 p.m., the ESPINO Vehicle left the area of Target Location 1 and traveled directly to the area of Target Location 2, arriving at 2:37 p.m. The ESPINO Vehicle left the area of Target Location 2 five minutes later. The ESPINO Vehicle then traveled directly to area of Target Location 3, arriving at 3:04 p.m. Four minutes later, the ESPINO Vehicle left the area. The ESPINO Vehicle made a few stops, including one at a McDonald's restaurant in Lynn, Massachusetts, before returning to the area of Target Location 1.

74.    Based on prior observations of drug-related activity at Target Locations 2 and 3, and that the ESPINO Vehicle stayed in the areas of Target Locations 2 and 3 for five and four minutes respectively, I believe the purpose of the ESPINO Vehicle's short stops at Target Locations 2 and 3 were to deliver drugs or drug proceeds.

**Target Locations**

***Description and Criminal Activity at Target Locations***

(1) Target Location 1

75.    **560 Warren Street, Apartment 2, Boston, Massachusetts,** is located on the second floor of a three-floor, multi-family residence. The address appears to be on the border between Dorchester and Roxbury, so I have used the term "Boston" to describe the city in which

it is located. A detailed description and photograph appear in Attachment A-1, which is attached hereto and incorporated herein by reference.

76.    As described above, investigators determined that ESPINO resides in Target Location 1. Additionally, utility records show that the customer residing at Target Location 1 is "Candelario Estino" and lists the ESPINO Phone as the contact telephone number. RMV records show that ESPINO has a motorcycle registered at Target Location 1.

77.    As described above, ESPINO left from and returned to Target Location 1 before and after engaging in suspected drug trafficking activity. Such activity includes round-trip journeys to places where known drug customers or suspected co-conspirators live. Additionally:

- On December 18, 2024, ESPINO appeared to conduct a hand-to-hand transaction shortly after leaving the area of Target Location 1. Later that day, investigators believe that ESPINO asked someone to deliver controlled substances to ESPINO at Target Location 1. Shortly after midnight the next morning, ESPINO returned to Target Location 1 after engaging in what appeared to investigators as a series of transactions in which ESPINO delivered drugs to and collected drug proceeds from various people.

- On November 25, 2024, ███████ delivered about one kilogram of fentanyl to Nunez-Guerrero shortly after exiting the building that contains Target Location 1.

- On January 14, 2025, the ████████████ stopped at or near Target Location 1 before making a late evening, round-trip to Providence to an area in which investigators observed suspected drug trafficking activity about ten days before, which indicates that ████████ sourced drugs, proceeds, or both from Target Location 1.

78.    Based on the above, I believe that evidence of ESPINO and/or other Target Subjects' drug trafficking activities, including drug proceeds, drug packaging materials, records/ledgers, detailing drug transactions and drug debts, customer lists, phones used to conduct drug business, and/or records of wire transfers and money laundering activities, as detailed in Attachment B, will be found inside Target Location 1.

(2) Target Location 2

79.    **6 Hillside Avenue, Basement, Chelsea, Massachusetts**, is located in what appears to be a multi-family residence. A detailed description and photograph if the building appears in Attachment A-2, which is attached hereto and incorporated herein by reference.

80.    As described above, a trash pull executed on January 6, 2025, revealed mail addressed to Mazin at the building that contains Target Location 2, as well as residue that field-tested positive for methamphetamine. The mail for Mazin does not contain an apartment number, but a police report from January 6, 2025, and a food delivery receipt indicate that Mazin lives in a basement apartment at that residence. Utility records show that the individuals residing at Target Location 2 are Diane Mazin, for Apartment 1, and Albert Mazin for Apartment B. RMV Records show Diane Mazin, Albert Mazin, and Mazin are the only licensed operators associated with Target Location 2. MAZIN's criminal record shows that his parents are Diane Mazin and Albert Mazin. Given that his parents live at that address, Mazin may have access to the other floors.

81.    ESPINO frequently traveled to the area of Target Location 2 at times at which messages indicate that he was looking to deliver or retrieve drugs or drug proceeds.

- On December 18, 2024, after stating, in coded language, that he needed to pick up money to buy more drugs, ESPINO went to Target Location 2 for about ten minutes.

- On December 22, 2024, ESPINO messaged UP1, a suspected courier, that "Chelsea," which I believe is code for Mazin, who lives at Target Location 2 in Chelsea, had "cash" for ESPINO that UP1 could "scoop," and told UP1 that "Chelsea (Mazin) be home by 6."

- Four days later, on December 26, 2024, ESPINO told UP1 that "Chelsea" had money for a quarter pound of drugs and that UP should go to Target Location 2 to deliver drugs and pick up money.  On that day, ESPINO directed UP1 to go "down," meaning to the basement apartment of 6 Hillside Avenue, which is Target Location 2, when no one answered the front door of the residence.

- In late January and early February 2025, GPS tracking data showed that ESPINO continued to make short trips to the area of Target Location 2 that were consistent with drug dealing.

82.    Additionally, on June 6, 2024, ESPINO directed ORTEGA to drop off drugs at Target Location 2 for a refund, noting that the "guy" there (Mazin) could sell them.

83.    Based on the above, I believe that evidence of Mazin and/or other Target Subjects' drug trafficking activities, including drug proceeds, drug packaging materials, records/ledgers, detailing drug transactions and drug debts, customer lists, phones used to conduct drug business, and/or records of wire transfers and money laundering activities, as detailed in Attachment B, will be found inside of Target Location 2.

<u>(3) Target Location 3</u>

84.    **16 Margin Street, Apartment 6, Lynn, Massachusetts,** is located on the second floor of a three-floor, multi-family residence. A detailed description and photograph appear in Attachment A-3, which is attached hereto and incorporated herein by reference.

85.    While RMV records show Jose Ortega-Minervino is the only person with a vehicle currently registered to Target Location 3, investigators believe, based on the information described above, that ORTEGA resides there. That information includes ORTEGA's criminal record, which list Target Location 3 as ORTEGA's address, as well as an iMessages from ESPINO directing a runner to Target Location 3 to meet with "Oliver."

86.    As described above, ESPINO frequently traveled to the area of Target Location 3 during times at which iMessages obtained pursuant to the January 2025 iCloud Warrant showed that he was looking to deliver or retrieve drugs or drug proceeds.  For example:

- On December 18, 2024, after exchanges iMessages with ORTEGA in which ESPINO stated he needed to buy drugs and ORTEGA said he had ESPINO's money, investigators believe that ESPINO travelled to Target Location 3 to collect those proceeds before arranging that afternoon to buy more drugs.

- Investigators also believe that, later that same day (December 18, 2024), after obtaining drugs, ESPINO sent iMessages to ORTEGA asking ORTEGA for drug proceeds so that ESPINO could supply ORTEGA with drugs to sell while ESPINO

was away, drove to Target Location 3, and stayed there for just ten minutes before making several other stops that were consistent with drug trafficking activity.

- Investigators also believe that iMessages also show that, on January 2, 2025, ESPINO directed a runner, UP1, to go to Margin Street in Lynn (where the building containing Target Location 3 is located) and "hit up Oliver" to drop off drugs and pick up proceeds. ORTEGA's first name is Oliver.

- Finally, between January 19, 2025, and February 5, 2025, ESPINO continued to make short trips to Target Location 3.

87.     Based on the above, I believe that evidence of ORTEGA's and/or other Target Subjects' drug trafficking activities, including drug proceeds, drug packaging materials, records/ledgers, detailing drug transactions and drug debts, customer lists, phones used to conduct drug business, and/or records of wire transfers and money laundering activities, as detailed in Attachment B, will be found inside of Target Location 3.

### Drug Traffickers' Use of Residences and Cell Phones Generally

88.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of the traffickers' residences.

a.      Controlled substances and materials used to "cut" or dilute those substances;

b.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics;

c.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units;

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills;

e.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records;

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities;

g.      Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments;

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys;

i.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators;

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents;

k.      Books, records, receipts, bills of lading, notes, ledgers, papers, business records, packaging, and other items relating to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, including, but not limited to, materials, chemicals, tools and literature related to firearms; and

l.      Safes or other locked containers and their contents to be searched for the listed items.

89.     Based upon my training and experience, as well as the training and experience of other law enforcement agents with whom I have worked, I am aware that it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their

residences. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

90.    Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

91.    Based upon my training and experience, as well as the training and experience of other law enforcement agents with whom I have worked, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money

26

laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

92.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

93.     Drug traffickers, even those who do not sell firearms, often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically call the police when they are robbed of drugs or drug proceeds, and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. Further, since drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, body armor, firearm cleaning kits, scopes, holsters and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, businesses, stash houses, on their persons and in their vehicles.

94.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. As described above, the Target Subjects used cellular telephones to communicate with each other to coordinate deliveries and collection of drugs and drug proceeds. In my training and experience, I also am aware that drug traffickers are often aware

of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

95.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other

agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

96.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

97.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in various was, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

    a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.     Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data

contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## Conclusion

98.     WHEREFORE, I submit that there is probable cause to believe that ESPINO, ███████, and ORTEGA conspired with each other and other people, known and unknown, to distribute and possess with intent to distribute 400 grams or more of fentanyl and 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846, and that evidence of the Charged Offense and the Target Offenses, described more fully in Attachment B, will be found in Target Locations 1, 2, and 3, which are described more fully in Attachments A-1, A-2, and A-3.

Respectfully submitted,

Nicholas D. Precourt /by Paul G. Levenson
Nicholas D. Precourt, Task Force Officer
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on February 12, 2025

Honorable Paul G. Levenson
United States Magistrate Judge